No. 14-20222

———— ♦ ————

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———— ♦ ————

**AMERICAN HOME ASSURANCE COMPANY,**
**Plaintiff/Appellee/Cross-Appellant**

**vs.**

**OCEANEERING INTERNATIONAL, INC.**
**Defendant/Appellant/Cross-Appellee**

———— ♦ ————

**Appeal from the**
**United States District Court**
**For the Southern District of Texas,**
**Houston Division**

———— ♦ ————

## PRINCIPAL AND RESPONSE BRIEF OF
## APPELLEE, AMERICAN HOME ASSURANCE COMPANY

Jeffrey R. Bale
Jonathan C. Anderson
The Bale Law Firm, PLLC
1600 Highway 6 South, Suite 200
Sugar Land, Texas 77478
Telephone:  (281) 295-6000
Facsimile:   (281) 295-6010
Email:  jbale@balelawfirm.com
*Attorneys for Appellee/Cross-Appellant,*
*American Home Assurance Company*

# CERTIFICATE OF INTERESTED PERSONS

No. 14-20222, *American Home Assurance Company v. Oecaneering International, Inc.*; from the United States District Court for the Southern District of Texas, Houston Division; No. 4:12-cv-02540.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiff/Appellee/Cross-Appellant:**
American Home Assurance Company

**Attorneys of Record for Plaintiff/Appellee/Cross-Appellant:**
Jeffrey R. Bale
Jonathan C. Anderson
The Bale Law Firm, PLLC
1600 Highway 6 South, Suite 200
Sugar Land, Texas 77478
Telephone:   (281) 295-6000
Facsimile:   (281) 295-6010

**Defendant/Apellant/Cross-Appellee**
Oceaneering International, Inc.

**Attorneys of Record for Defendant/Appellant/Cross-Appellee**
Michael A. Orlando
Kristi L. Hamilton
Mike A. Orlando, Jr.
Meyer Orlando, LLC
13201 Southwest Freeway, Suite 119
Houston, Texas 77040
Telephone:   (713) 460-9800
Facsimile:   (713) 460-9801

*//s// Jeffrey R. Bale*
Jeffrey R. Bale
Attorney of record for Appellee/Cross-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Rule 34(a)(1) of the Federal Rules of Appellate Procedure, and Fifth Circuit Rule 28.2.3, Appellee, American Home Assurance Company respectfully requests oral argument.  American Home believes that oral argument will be helpful to the Court because of the numerous and complicated issues relating to coverage under the policy in question.  Moreover, American Home finds it best for the parties to present their arguments before the very Court that previously decided many of the facts currently at issue in this coverage dispute.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................ i

STATEMENT REGARDING ORAL ARGUMENT .............................. ii

TABLE OF CONTENTS ................................................................ iii

TABLE OF AUTHORITIES ........................................................... v

JURISDICTIONAL STATEMENT ................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............... 2

I. STATEMENT OF THE CASE ..................................................... 3

    A. Factual Background .......................................................... 3

        1.  The Incident ............................................................. 3

        2.  Underlying Litigation ................................................ 5

    B. Procedural History ........................................................... 6

II. SUMMARY OF ARGUMENT ..................................................... 9

    A. The bolts did not cause "property damage" to the Genesis Spar. .................. 9

    B. The district court was correct in holding that the "sistership" exclusion applies, barring coverage in this case. ....................................... 12

    C. Oceaneering's claims are also barred under the contractual liability exclusion. ................................................................. 12

III. STANDARD OF REVIEW ....................................................... 13

IV. ARGUMENT & AUTHORITIES ................................................ 14

    A. The district court erred by not granting American Home's Cross-Motion for Final Summary Judgment on the issue of "property damage." .............. 14

        1.  In order for there to be coverage, there must be physical injury to tangible property beyond the insured's defective work product. ........... 15

2.  American Home has presented irrefutable evidence showing that Chevron only sought to recover its costs in replacing the defective bolts................................................................................. 17

3.  Despite having no evidence of any physical injury to the Genesis Spar, Oceaneering argues that a finding of "property damage" can be inferred from this Court's holding in *Chevron I*............................... 22

4.  The duty to indemnify is based on facts, not speculation. The district court speculated as to whether there was latent physical damage to the Genesis Spar.................................................. 26

5.  Oceaneering has failed to meet its burden of establishing American Home's duty to indemnify................................................ 29

B.  The district court was correct in its application of the "sistership" exclusion. ................................................................... 31

1.  The district court correctly differentiated between the bolts whose heads were missing and the remaining "sister" bolts because only the former were shown to have caused "property damage" to the Genesis Spar. ........................................................... 31

2.  Oceaneering's work on the Genesis Spar qualifies as "your work" and/or "your product" as these terms are defined under the policy. ...... 32

C.  Coverage is also barred under the contractual liability exclusion.................. 34

V.  PRAYER ............................................................................. 35

CERTIFICATE OF SERVICE ............................................................ 37

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) ................................. 38

# TABLE OF AUTHORITIES

## Cases

*Am. Intern. Specialty Lines Ins. Co. v. Rentech Steel LLC*,
    620 F.3d 558 (5th Cir. 2010) ....................................................... 13

*Art Midwest Inc. v. Atl. Ltd. P'ship XII*,
    742 F.3d 206, 211 (5th Cir. 2014) ................................................ 9

*Balandran v. Safeco Ins. Co. of Am.*,
    972 S.W.2d 738 (Tex. 1998) ................................................. 14, 25

*Blanton v. Cont'l Ins. Co.*,
    No. 12-20344, 2014 WL 1679014 (5th Cir. Apr. 24, 2014)........................ 15

*Building Specialties, Inc. v. Liberty Mutual Fire Insurance Company*,
    712 F.Supp.2d 628 (S.D. Tex. 2010)........................................ 16, 17

*Chevron USA, Inc. v. Aker Maritime, Inc., et al.*,
    604 F.3d 888 (5th Cir. 2010) ................................. 6, 10, 11, 12, 22, 23, 26, 30

*Chevron USA, Inc. v. Aker Maritime, Inc., et al.*,
    689 F.3d 497 (5th Cir. 2012) ....................................................... 6

*Chevron USA, Inc. v. Aker Maritime, Inc., et al.*,
    No. 03-2027, 2008 WL 594650 (E.D. La. Jan. 2, 2008) ................................ 6

*Chevron USA, Inc. v. Aker Maritime, Inc., et al.*,
    No. 03-2027, 2011 WL 999253 (E.D. La. Mar. 17, 2011)............................ 6

*Coker v. Coker*,
    650 S.W.2d 391 (Tex. 1983) ...................................................... 14

*D.R. Horton-Texas, Ltd. v. Markel Intern. Ins. Co., Ltd.*,
    300 S.W.3d 740 (Tex. 2009) ................................................. 27, 30

*Dahlen v. Gulf Crews, Inc.*,
    281 F.3d 487 (5th Cir. 2002) ...................................................... 13

*Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*,
    267 S.W.3d 20 (Tex. 2008)......................................................... 27

*Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*,
    197 F.3d 720 (5th Cir. 1999) ...................................................... 29

*Ferrell v. W. Bend Mut. Ins. Co.*,
    393 F.3d 786 (8th Cir. 2005) ...................................................... 24

*Goodyear Rubber & Supply Co., Inc. v. Great Am. Ins. Co.*,
 471 F.2d 1343 (9th Cir. 1973) ........................................................... 15

*Hauenstein v. St. Paul-Mercury Indem. Co.*,
 65 N.W.2d 122 (Minn. 1954) ............................................................. 15

*Hollybrook Cottonseend Processing, LLC v. Carver, Inc., et al.*,
 No. 09-0750, 2010 WL 2195685, (W.D. La. May 28, 2010)....................... 25

*James v. Bell Helicopter Co.*,
 715 F.2d 166 (5th Cir. 1983) .............................................................. 23

*Kelley v. Price-Macemon, Inc.*,
 992 F.2d 1408 (5th Cir. 1993) ............................................................ 18

*Lamar Homes, Inc. v. Mid-Continent Cas. Co.*,
 242 S.W.3d 1 (Tex. 2007).................................................... 15, 24, 25

*Lopez v. Munoz, Hockema & Reed, LLP*,
 22 S.W.3d 857 (Tex. 2000)................................................................ 14

*McFaul v. Valenzuela*,
 684 F.3d 564 (5th Cir. 2012) .............................................................. 13

*Mid-Continent Cas. Co. v. JHP Dev., Inc.*,
 557 F.3d 207 (5th Cir. 2009) .............................................................. 15

*Murray v. State Farm Fire & Cas. Co.*,
 509 S.E.2d 1 (W. Va. 1998)................................................................ 29

*Northfield Ins. Co. v. Loving Home Care, Inc.*,
 363 F.3d 523 (5th Cir. 2004) .............................................................. 27

*Piazza's Seafood World, LLC v. Odom*,
 448 F.3d 774 (5th Cir. 2006) .............................................................. 13

*Pugh v. Gen. Terrazzo Supplies, Inc.*,
 243 S.W.3d 84 (Tex.App.—Houston [1st Dist.] 2007, pet. denied) ........... 23

*R & P Enters. v. LaGuarta, Garvel & Kirk, Inc.*,
 596 S.W.2d 517 (Tex. 1980) .............................................................. 14

*State Farm Fire & Cas. Co. v. Reed*,
 873 S.W.2d 698 (Tex. 1983) .............................................................. 14

*State Farm Fire & Cas. Co. v. Vaughan*,
 968 S.W.2d 931 (Tex. 1998) .............................................................. 14

*Strickland v. Fed. Ins. Co.*,
 246 Cal. Rptr. 345 (Cal. App. 2d Dist. 1988)................................. 28, 29

*Todd Shipyards Corp. v. Turbine Serv., Inc.,*
    674 F.2d 401 (5th Cir. 1982) ........................................................ 31

*Travelers Cas. & Sur. Co. of Am. v. Baptist Healthy Sys.,*
    313 F.3d 295 (5th Cir. 2002) ....................................................... 13

*Travelers Indem. Co. v. Page & Assocs. Const. Co.,*
    No. 07-97-0338-CV, 1998 WL 720957 (Tex.App.—Amarillo Oct. 15, 1998)
    ............................................................................................ 28

*Trinity Univ. Ins. Co. v. Cowan,*
    945 S.W.2d 819 (Tex. 1997) ....................................................... 30

## Statutes

28 U.S.C. § 1291 ...................................................................................... 1
28 U.S.C. § 1332(a) ................................................................................. 1

## Rules

FED. R. APP. P. 28(a)(4)(A)-(D).............................................................. 1
FED. R. APP. P. 28(a)(5) ........................................................................... 2
FED. R. APP. P. 4(a).................................................................................. 1
FED. R. CIV. P. 56(a) .............................................................................. 13
Fed. R. Civ. P. 56(c)............................................................................... 18

## Other

Allan D. Windt, INSURANCE CLAIMS & DISPUTES: REPRESENTATION OF INSURANCE
    COMPANIES & INSUREDS § 11:1 (5th ed. 2010)...................................17

## JURISDICTIONAL STATEMENT

Pursuant to Rule 28(a)(4)(A)-(D) of the Federal Rules of Appellate Procedure, American Home provides the following jurisdictional statement.

The district court had subject matter jurisdiction over this coverage dispute pursuant to 28 U.S.C. § 1332(a), in that there is complete diversity between the parties, and the amount in controversy exceeds $75,000.

This Court has jurisdiction over this coverage dispute pursuant to 28 U.S.C. § 1291 because on March 17, 2014, the district court entered a Final Judgment disposing of all the claims remaining in the case.

Both parties complied with Rule 4(a) of the Federal Rules of Appellate Procedure by filing their Notices of Appeal within 30 days of the Final Judgment being entered. Oceaneering's Notice of Appeal was filed on April 11, 2014. American Home's Notice of Cross-Appeal was filed on April 14, 2014.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Pursuant to Rule 28(a)(5) of the Federal Rules of Appellate Procedure, American Home raises the following issues on appeal, mainly whether the district court erred by not granting its Cross-Motion for Final Summary Judgment in its entirety.  More specifically:

1.  Did the district court err in finding a genuine issue of material fact with respect to "property damage"?

2.  Was the district court correct in holding that the "sistership" exclusion applies to bar coverage in this case?

3.  Is coverage also barred under the contractual liability exclusion?

# I. STATEMENT OF THE CASE

## A. Factual Background

This is an insurance coverage dispute. American Home Assurance Company ("American Home") issued a commercial general liability policy to Oceaneering International, Inc. ("Oceaneering").[1] During the policy period, Oceaneering installed defective bolts into an offshore oil rig known as the Genesis Spar. The bolts did not cause any physical damage or loss of use to the spar. Rather, Chevron USA, Inc. ("Chevron"), the spar's owner, only sought to recover its costs in replacing the defective bolts. Chevron successfully sued Oceaneering, Aker Maritime, Inc. ("Aker"), and other defendants for the replacement costs. Aker was later awarded full contractual indemnification against Oceaneering. Oceaneering now seeks coverage for the contractual indemnification costs it paid to Aker.

### 1. The Incident

The Genesis Spar is located in the Gulf of Mexico approximately 150 miles south of New Orleans. The spar has 16 subsea risers (collectively, referred to as the "riser system"), which are a network of pipes used to extract oil, gas, and other minerals from beneath the ocean floor. Each riser is contained within a steel frame

---

[1] American Home first issued a commercial general liability policy bearing, No. C1746. (ROA.17-67). That policy was later cancelled and reissued under a commercial general liability marine package policy, bearing No. C1854. (ROA.69-134). With respect to the issues presented for review in this coverage dispute, the policies contain identical language. However, since Policy C1746 was cancelled, this brief will only address the scope of coverage in Policy C1854.

known as a guide frame. The guide frames are used to prevent excessive movement of the risers.

Shortly after the Genesis Spar was commissioned, Chevron decided to make some improvements to the riser system. It hired Aker to design those improvements, which ultimately consisted of a series of rubber bumpers that were to be attached to each guide frame. The design called for the use of SAEJ429 Grade 5 carriage bolts. Aker placed an order for the Grade 5 carriage bolts but was told by the bolt manufacturer that they were unavailable. After consultation with Chevron, Aker placed an order for SAEJ429 Grade 2 carriage bolts.

The bolts were delivered to Oceaneering, which was in charge of installing the bumpers into the guide frames. Unbeknownst to Oceaneering, the bolts were the wrong kind. Instead of receiving Grade 2 carriage bolts, Oceaneering had actually received ASTM307A-OF Grade A carriage bolts. Oceaneering began work on the guide frames, failing to notice the substitution. It installed 7 of 343 bumpers before the work was assigned to a co-defendant for completion.[2]

In July 2002, after nearly all of the bumpers had been installed, Chevron discovered for the first time that some of the bolts had failed. A dive team inspected the riser system and found that several bolt heads were missing. The following month, Aker, Oceaneering, and Chevron investigated the bolts failures.

---

[2] The remaining guide frames were assembled by Technip Offshore Mooring, Inc., which was later named as a co-defendant in the underlying litigation.

During their review they discovered that not only were the bolts the wrong kind, they were also defective because the manufacturer failed to stress-relieve and heat-treat the bolts. Chevron ultimately decided to replace all of the Grade A carriage bolts that had been installed into the Genesis Spar.

## 2. Underlying Litigation

In July 2003, Chevron filed suit against Aker, Oceaneering, and several other defendants. Because Chevron only sought to recover its replacement costs, its Original Complaint did not contain any allegations of "property damage." (ROA.555-571). Oceaneering, however, still made a demand for defense and coverage under the policy to which American Home denied. (ROA.136-139). The parties then conducted extensive discovery over the next four years. During this time, American Home heard nothing from Oceaneering.

In February 2007, just a few months before trial, Chevron made its first allegations of "property damage" upon the filing of its Third Amended Complaint. (ROA.636-639).[3] Oceaneering then resubmitted its claim to American Home. American Home agreed that coverage was potentially triggered, issued a reservation of rights, and provided a qualified defense. (ROA.141-144).

In June 2007, the underlying case was tried in the Eastern District of Louisiana. During the course of that proceeding, there was not a single mention of

---

[3] Copies of Chevron's First and Second Amended Complaints can be found at (ROA.577-593) and (ROA.594-635), respectively.

third-party property damage. Chevron offered no evidence of physical injury or loss of use to the spar. More importantly, Chevron did not seek damages for physical injury or loss of use. Chevron only sought to recover its costs in replacing the defective bolts. A jury awarded Chevron approximately $3 million. Aker was found 40% liable for the loss, and Oceaneering was found 5% liable. (ROA.146-151).[4]

A separate bench trial was held to determine whether Aker was entitled to indemnification from Oceaneering. Chevron and Oceaneering had previously entered into a master service contract wherein Oceaneering agreed to indemnify Chevron and its "agents" on a variety of projects, including the Genesis Spar. (ROA.905-909). The trial court held that Aker was Chevron's agent at the time the bolts were installed, and therefore, it was entitled to complete indemnification from Oceaneering.[5] Following affirmance by this Court, Oceaneering paid Aker approximately $2 million and subsequently sought coverage from American Home. (ROA.197-205).

## B. Procedural History

On August 23, 2012, American Home filed a declaratory judgment action in the Southern District of Texas seeking a declaration that the policy did not cover

---

[4] *See Chevron USA, Inc. v. Aker Maritime, Inc., et al.*, No. 03-2027, 2008 WL 594650 (E.D. La. Jan. 2, 2008), *aff'd in part*, 604 F.3d 888 (5th Cir. 2010).

[5] *See Chevron USA, Inc. v. Aker Maritime, Inc., et al.*, No. 03-2027, 2011 WL 999253 (E.D. La. Mar. 17, 2011), *aff'd*, 689 F.3d 497 (5th Cir. 2012)

Oceaneering's payment to Aker. (ROA.8-164). Oceaneering countersued for (1) breach of contract; (2) breach of duty of good faith and fair dealing; (3) violations of the Texas Insurance Code; and (4) a declaratory judgment that its payment to Aker was covered under the policy. (ROA.171-205).

On January 4, 2013, Oceaneering filed its Motion for Partial Summary Judgment. (ROA.206-387). It argued that coverage exists as a matter of law because (1) the bolts caused "property damage" to the Genesis Spar; (2) none of the policy exclusions apply, except for the contractual liability exclusion; but (3) the "insured contact" exception applies thereby bringing its claim back into coverage. American Home filed a Response (ROA.535-744), Oceaneering filed a Reply (ROA.746-755), and American Home filed a Sur-Reply (ROA.762-775).

On September 9, 2013, American Home filed its Cross-Motion for Final Summary Judgment. (ROA.777-971). It argued that coverage should be denied as a matter of law because (1) the bolts did not cause "property damage" to the Genesis Spar; (2) the "sistership" exclusion applies; and (3) the contractual liability exclusion applies with Oceaneering's claims not falling under the "insured contract" exception. Oceaneering filed a Response (ROA.989-1002), American Home filed a Reply (ROA.1003-1012), and Oceaneering filed a Sur-Reply (ROA.1013-1018).

This matter was ultimately referred to Magistrate Stephen Smith. (ROA.1019). On February 18, 2014, Magistrate Smith entered his Memorandum and Recommendation (ROA.1035-1050) in which he recommended that Oceaneering's Motion for Partial Summary Judgment be denied in its entirety and that American Home's Cross-Motion for Final Summary Judgment be granted in part. Magistrate Smith held that none of the parties met their burden with respect to "property damage."[6] However, Magistrate Smith held that American Home did meet its burden with respect to the sistership exclusion. Therefore, coverage is denied as a matter of law. Because of the recommended disposition, Magistrate Smith did not reach a decision as to the contractual liability exclusion or the "insured contract" exception thereto.

Both parties filed Objections to the Magistrate's Memorandum and Recommendation. (ROA.1051-1133). On March 17, 2014, District Judge David Hittner entered an Order (ROA.1134) adopting the Recommendation. Later that day, Judge Hittner also issued a Final Judgment (ROA.1135), which states that Oceaneering shall take nothing on its claims against American Home.

On April 11, 2014, Oceaneering filed its Notice of Appeal with this Court. (ROA.1136-1137). Likewise, on April 14, 2014, American Home filed its Notice

---

[6] Please note that throughout its Principal Brief, Oceaneering argues that the district court "correctly found there was 'property damage' to the Genesis Spar." This is incorrect and a mischaracterization of the court's holding. With regard to "property damage," the district court denied both parties' motions for summary judgment. Therefore, at most, there remains a genuine issue of material fact with respect to this issue.

of Cross-Appeal. (ROA.1138-1140).[7] American Home agrees with the ruling made by the district court in that the sistership exclusion applies to bar coverage in this case. However, American Home appeals the Final Judgment to the extent its Cross-Motion for Final Summary Judgment was not granted on the issues of "property damage" and the contractual liability exclusion.

## II.  SUMMARY OF ARGUMENT

### A. The bolts did not cause "property damage" to the Genesis Spar.

The incorporation of defective parts into a larger product does not, by itself, result in "property damage." Rather, the insured must prove that the incorporated, defective parts caused physical damage to the larger product. If the alleged harm is limited to the cost of replacing the insured's own defective work, there can be no coverage. It is apparent from the record that neither the defective bolts, nor their removal, caused physical injury to the Genesis Spar. Moreover, American Home attached as evidence certified copies of the trial transcript from the underlying litigation, which conclusively prove that the only damages ever at issue were the replacement costs of the defective bolts.

The district court, however, found there to be a genuine issue of material fact. This holding was primarily, if not solely, based upon the following language

---

[7] "Even a party who prevails in the district court is permitted to conditionally raise issues in a cross-appeal because if the appellate court decides to vacate or modify the trial court's judgment, the judgment may become adverse to the cross-appellant's interest." *Art Midwest Inc. v. Atl. Ltd. P'ship XII*, 742 F.3d 206, 211 (5th Cir. 2014).

used by this Court in the underlying litigation: "Chevron's damages incurred in repairing the spar are not economic loss. *The undisputed facts here show that the defective products, the bolts, have damaged other property, the spar. That damage is not economic loss...but property loss.*"[8]      Indeed, in his Memorandum and Recommendation, Magistrate Smith concluded that:

> The difficulty is that the Court's opinion does not explain in what way the spar has been damaged, aside from a few bolts with popped heads. Perhaps the Court was convinced that the structural integrity of the entire facility was compromised by the sub-standard bolts, much the same way as a dam weakened by an earthquake. The damage to the structure may not be immediately apparent from the naked eye, but will become all too apparent when the structure ultimately does collapse. Damage to the structural integrity of a larger structure is not an implausible type of "property damage," and offers a reasonable basis to distinguish the legal authorities relied upon by American Home.
>
> For this reason, the court is not inclined to controvert or disregard the Fifth Circuit's considered characterization of the damage done to the Genesis Spar in this case. American Home's motion on this ground should be denied (ROA.1046).

The above excerpt from *Chevron I* has no bearing on questions of insurance coverage. Therefore, the district court erred by using the opinion as a basis for finding a genuine issue of material fact. In *Chevron I*, the Fifth Circuit merely

---

[8] *See Chevron USA, Inc.*, 604 F.3d at 901 (emphasis added). Throughout its Principal Brief, Oceaneering refers to this opinion as "*Chevron I.*" For the sake of consistency, American Home will also refer to the opinion as "*Chevron I*" throughout the body of its Principal and Response Brief.

characterized Chevron's damages as a form of non-economic loss.[9] Non-economic loss is not necessarily a loss that is covered under the policy. The proper inquiry is whether an "occurrence" has caused "property damage," not whether the ultimate remedy for that claim lies in contract or tort. Regardless of the theory of recovery, the insured must present evidence showing physical injury to tangible property beyond its own defective work product, something which Oceaneering has failed to do.

The district court also erred by speculating as to the existence of latent physical damage. It is true that "property damage" occurs when actual physical damage takes place, rather than when the damage manifests itself or becomes discoverable. However, it has now been more than 12 years since the bolts were installed into the Genesis Spar. If any entity was concerned about latent physical damage, it would have most certainly been Chevron when it filed suit. Instead, Chevron chose only to seek damages for its replacement costs. Furthermore, "damage to structural integrity" is not a recognized form of "property damage."

Finally, the insured bears the burden of establishing the insurer's duty to indemnify by presenting sufficient facts to demonstrate coverage under the policy. Since the inception of this coverage dispute, Oceaneering has failed to produce a single document evidencing "property damage" to the Genesis Spar. Instead, it

---

[9] *See Chevron USA, Inc.*, 604 F.3d at 899-901.

chooses to solely rely upon this Court's holding in *Chevron I*, an opinion that is factually and legally inapposite from the present case.

## B. The district court was correct in holding that the "sistership" exclusion applies, barring coverage in this case.

The "sistership" exclusion limits coverage for preventative or curative acts taken to prevent future accidents or property damage. Only some bolts were shown to have caused property damage to the spar. The other "sister" bolts were removed out of an abundance of caution so as to prevent future physical damage. This falls squarely into the meaning and intent of the sistership exclusion. Furthermore, despite Oceaneering's assertions to the contrary, the work it performed on the Genesis Spar qualifies as "your work" and/or "your product" as these terms are defined under the policy.

## C. Oceaneering's claims are also barred under the contractual liability exclusion.

Because of the district court's recommended disposition of American Home's Cross-Motion for Final Summary Judgment, it did not reach a decision on the contractual liability exclusion and whether or not it precluded coverage in this case. Oceaneering's claims clearly fall under the terms of this exclusion, and none of the exceptions apply.

### III. STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 498 (5th Cir. 2002). Summary judgment is appropriate when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012). While the Court views the evidence in a light most favorable to the non-movant, in order to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial. *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 774, 752 (5th Cir. 2006).

This Court also reviews *de novo* the district court's determination of state law, as well as its interpretation of the insurance contract. *Travelers Cas. & Sur. Co. of Am. v. Baptist Healthy Sys.*, 313 F.3d 295, 297 (5th Cir. 2002). The state law applicable to this coverage dispute is that of Texas. Under Texas law, insurance policies are contracts and are interpreted according to the same principles that govern contract interpretation. *Am. Intern. Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010). The primary goal of contract interpretation is to ascertain the intent of the parties as expressed in the instrument. *R & P Enters. v. LaGuarta, Garvel & Kirk, Inc.*, 596 S.W.2d 517, 518

(Tex. 1980). A court must read all parts of the instrument together in order to give meaning to every sentence and to avoid rendering any portion inoperative. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998).

A contract is unambiguous as a matter of law if it can be given a definite or certain legal meaning. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). In other words, if the insurance policy is worded so that it can be given only one reasonable construction, it will be enforced as written. *State Farm Fire & Cas. Co. v. Reed*, 873 S.W.2d 698, 699 (Tex. 1983). Conversely, if the insurance policy is subject to more than one reasonable interpretation, it is ambiguous and the interpretation most favoring the insured is adopted. *State Farm Fire & Cas. Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998). Ambiguity does not arise, however, simply because the parties advance conflicting interpretations. *Lopez v. Munoz, Hockema & Reed, LLP*, 22 S.W.3d 857, 861 (Tex. 2000).

## IV. ARGUMENT & AUTHORITIES

### A. The district court erred by not granting American Home's Cross-Motion for Final Summary Judgment on the issue of "property damage."

"Property damage" is defined under Section V of the policy to mean (1) "physical injury to tangible property including all resulting loss of use of that property;" or (2) "loss of use of tangible property that is not physical injured." (ROA.89). It is undisputed that the Genesis Spar was in continuous use at all

material times, so there were no loss of use damages. Therefore, the coverage question turns on whether there was "physical injury to tangible property."

**1. In order for there to be coverage, there must be physical injury to tangible property beyond the insured's defective work product.**

The district court agreed with American Home (ROA.1044) in that this case is governed by the "incorporation" doctrine, a rule that is uniformly and unequivocally followed by Texas courts and the Fifth Circuit. Under this rule, the incorporation of defective parts into a larger product does not, by itself, result in "property damage." *Blanton v. Cont'l Ins. Co.*, No. 12-20344, 2014 WL 1679014, at \*6 (5th Cir. Apr. 24, 2014). That is because "CGL insurance is not for the repair or replacement of the insured's defective work product." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 10 (Tex. 2007). The insured must prove that the incorporated defective parts caused physical damage to the larger product.[10] Thus, if the alleged harm is limited to the cost of repairing or replacing the insured's defective work product, there can be no coverage. *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 215 (5th Cir. 2009).

---

[10] In its Principal Brief, Oceaneering argues that "property damage" can still occur regardless of whether the incorporated defective parts cause physical injury to the larger product. See, e.g., *Goodyear Rubber & Supply Co., Inc. v. Great Am. Ins. Co.*, 471 F.2d 1343, 1344 (9th Cir. 1973) (when one product is integrated into a larger entity and the product proves defective, the damage is considered as damage to the entity to the extent that the market value of the entity is reduced by an amount in excess of the value of the defective product); *Hauenstein v. St. Paul-Mercury Indem. Co.*, 65 N.W.2d 122, 125-26 (Minn. 1954) (presence of defective plaster on walls and ceilings reduced the value of the building and constituted property damage under an insurance policy). This is an incorrect statement of Texas law. Indeed, Oceaneering fails to cite to any authorities that are followed by Texas or the Fifth Circuit.

Proper application of this rule is perhaps best illustrated by *Building Specialties, Inc. v. Liberty Mutual Fire Insurance Company*, 712 F.Supp.2d 628 (S.D. Tex. 2010). In *Building Specialties*, the insured installed defective air conditioning ducts in a residential home causing water to leak onto a hardwood floor. *Id.* at 631-32. The entire ceiling had to be torn down in order to identify the source of the leak and remedy it. *Id.* at 632. Thus, at the time of repair, the homeowner had suffered physical injury to the air conditioning unit, the ceiling, and the hardwood floor. Because the homeowner only sought damages for the costs of replacing the defective duct work, i.e., the insured's work product, the trial court found there was no "property damage" to trigger coverage under the CGL policy. *Id.* at 641.[11]

The import of this holding is two-fold. First, the insured must prove there was physical injury beyond its own defective work product. In *Building Specialties*, the insured caused physical damage to other parts of the home. *Id.* at 631-32. Oceaneering's work is different in that its work never caused physical damage to other parts of the spar. The harm was limited solely to the costs in repairing or replacing the defective bolts. Thus, there was never any "property damage" that occurred to the Genesis Spar.

---

[11] As noted by the district court (ROA.1044), the policy language in *Building Specialties* is identical to the policy language in this case.

Second, even if "property damage" had occurred, the insured still must prove those damages were awarded in the underlying case. *See* Allan D. Windt, Insurance Claims & Disputes: Representation of Insurance Companies & Insureds § 11:1 (5th ed. 2010) ("It is not enough that the party suing the insured has incurred property damage; the damages being sought must be because of that property damage. And the issue is not whether the insured could be sued for such property damage; but whether it is being sued for such damage.").

In *Building Specialties*, the insured's defective work product caused physical damage to a hardwood floor, and yet, the homeowner did not seek nor was awarded damages for its replacement or repair. 712 F.Supp.2d at 641. Compared to the present case, there has never been any indication that the Genesis Spar suffered physical injury beyond the defective bolts. Even if there was, Chevron neither sought nor was awarded damages for that injury. Accordingly, there was no "property damage" to the Genesis Spar, and it was error by the district court not to grant American Home's Cross-Motion for Final Summary Judgment on this issue.

**2. American Home has presented irrefutable evidence showing that Chevron only sought to recover its costs in replacing the defective bolts.**

American Home has attached as evidence certified copies of the trial transcript from the underlying litigation, which conclusively prove that this case

has only ever been about the replacement of the insured's defective work product.[12] For example, in its opening statement Chevron framed the issues for the jury by outlining what the evidence would show and what it intended to prove. Miles Clements, Chevron's trial counsel, stated the following:

> We had to file this lawsuit to recoup, to ask for compensation, simply for the hard out-of-pocket costs that Chevron had to incur to pay to put the right bolts in the second time because the right bolts didn't go in the first time. That was a cost of a little over $3 million, between $3 million and $3.1 million.

> Mr. Herman (Chevron's corporate representative) will also give you testimony and describe what those expenses are. We have a stack of invoices about this high (indicating). Mr. Herman read every single one. He was Chevron's manager on this project. He will say this is what Chevron is out-of-pocket; not dealing with lost production or lost profits or any of those kinds of expenses, just what Chevron paid, over $3 million, to get the right bolts in place for the defective and the wrong bolts. (ROA.645-659, page 96, lines 7-20).

Arthur Herman II was Chevron's project manager, regulatory coordinator, and corporate representative for the Genesis Spar project. He worked extensively with various companies in installing the riser system. In characterizing the nature

---

[12] Oceaneering has previously argued that certified copies of trial transcripts are not proper summary judgment evidence. (ROA.746-755). This argument is without merit because "[i]t is well settled that a certified trial transcript from a judicial proceeding may be considered on a motion for summary judgment." *Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1415 n. 12 (5th Cir. 1993). While the Federal Rules of Civil Procedure do not expressly delineate the introduction of prior testimony as summary judgment evidence [Fed. R. Civ. P. 56(c) only refers to affidavits, depositions, and answers to interrogatories as competent summary judgment evidence], the Fifth Circuit has held that a district court may rely on trial transcripts in deciding a motion for summary judgment. *Kelley*, 992 F.2d at 1415 n. 12.

of the claims and damages in the underlying lawsuit, Mr. Herman stated the

following:

> Q: Let's move from that period to August 2, when you had that meeting that you told us about. What did you and the carriage bolt review team determine?
>
> A: In the August 2 meeting or overall?
>
> Q: Overall.
>
> A: Overall we determined that, you know, while we had ordered Grade 2 bolts, that's not what we got and not what got installed. The team agreed that all of the Grade A bolts that had been installed needed to be replaced, and that meant diving underwater to replace those. Basically, the material that we ordered was not what we got received and got installed.
>
> Q: And had to be replaced?
>
> A: And had to be replaced.
>
> Q: Subsequently, was it replaced?
>
> A: It was replaced, and we selected the material to replace it with.
>
> Q: What was it replaced with?
>
> A: It was replaced with an L&M, which is a different grade bolt. (ROA.661-726, page 59, line 24 through page 60, line 17).
>
> * * * * *
>
> Q: Who paid for the replacement of the bolts?
>
> A: Chevron paid for the replacement. I forgot to mention one other thing that the bolt review team agreed on was that the Grade 5 bolts that had been purchased and installed, those were okay to remain in service. It was only the Grade A bolts that were improperly installed

that we had to replace. (ROA.661-726, page 60, line 25 through page 61, line 6).

As to the nature of the damage sustained by Chevron, Mr. Herman detailed with specificity how Chevron tracked its expenses in regard to the Genesis Spar project. He established that the overall cost of the project related to nothing more than replacement costs for the Grade A bolts. (ROA.661-726, page 62, line 23 through page 67, line 3).

This was again confirmed by Mr. Clements in his closing argument. Here, it is more than evident that Chevron never sought any damages for physical injury to, or loss of use of, the Genesis Spar. To the contrary, Mr. Clements clearly outlined his position in respect to the money he was seeking when he stated the following:

> ...1900 bolts went offshore, were installed on the Genesis and subsequently failed. Wrong bolts; wrong torque; bad bolts; that's the case. (ROA.728-744, page 65, line 24 through page 66, line 1).

> \* \* \* \* \*

> ...Now, no one asked Mr. Herman a single question about the money that Chevron spent, the $3.8 million. Mr. Herman reviewed every single invoice; prepared this summary; showed that you know Oceaneering was paid over $2.1 million. Aker was paid $176,000. And this is all that was spent to pay for bolt replacements. He testified these were all expenses that were necessary, that were necessary for bolt replacement. They were reasonable. They were submitted to Chevron; reviewed them; proved and paid them. And he said there was actually another $68,000 that was also coded that was reviewed by Chevron at the time, the same time. We didn't put it in a summary. Mr. Herman said it's because a week before trial he didn't get a chance to look at the invoices. (ROA.728-744, page 66, line 19 through page 67, line 6).

* * * * *

This is not in dispute. These are not invoices that anyone needs to pour [sic] over any further. If there was a question with any of those they would have been asked. They weren't. This is what Chevron had to pay to right the wrongs of these Defendants in this case. (ROA.728-744, page 67, lines 19-22).

The trial court itself acknowledged the nature of Chevron's claims when reading the charge to the jury. Specifically, the court read the following:

Now, the Defendant [sic] have raised various defenses, but all the Defendants assert that they were not negligent in their actions nor that their actions were not the legal cause of the need to replace the Grade A 307 carriage bolts. (ROA.966-971, page 34, line 25 through page 35, line 3).

Additionally, when admonishing the jury about deliberating on the damage claims, the Court instructed that:

If you decide to award for compensatory damages you should be guided by dispassion and common sense. Computing damages may be difficult but you must not let that difficulty lead you to engage in arbitrary guesswork. On the other hand, the law does not require that Plaintiff prove the amount of his losses with mathematical precision but only with as much definiteness and accuracy as the circumstances permit. You must use sound discretion in fixing an award of damages, drawing reasonable inferences where you find them appropriate from the facts and circumstances. The determination of damages is solely your function, and it must be based on competent evidence. (ROA.966-971, page 45, lines 16-25).

As evidenced by the instructions provided by the court, the parties did not present, nor did the jury consider, evidence regarding (1) repair costs for physical damage to property; (2) diminished value of damaged property; or (3) replacement

costs for property that had been physically damaged. Had these elements of damage been integral to the award Chevron sought, the jury would have been given guidance and instructions on what to consider and how to calculate these losses. At the very least, Chevron would have submitted such instructions, but there is no evidence in the trial record of it ever having done so.

In sum, the only competent evidence ever presented to the jury regarding damages was for the replacement costs of the defective bolts. The jury was never presented with anything regarding physical injury or loss of use. These damages are not covered under the policy thereby entitling American Home to judgment as a matter of law.

### 3. Despite having no evidence of any physical injury to the Genesis Spar, Oceaneering argues that a finding of "property damage" can be inferred from this Court's holding in *Chevron I*.

In *Chevron I*, the Fifth Circuit was tasked with determining whether Chevron was entitled to an award of attorney's fees from the manufacturer of the defective bolts. *Chevron USA, Inc.*, 604 F.3d at 899-901. This meant the Court had to determine whether Chevron's claims fell under the Louisiana Products Liability Act (the "LPLA") or the redhibition articles. The redhibition articles allow for an award of attorney's fees while the LPLA does not. *Id.* at 899. Applying the economic loss doctrine, this Court ultimately concluded that "Chevron's damages incurred in repairing the spar are not economic loss. The

undisputed facts...show that the defective products, the bolts, have damaged other property, the spar. That damage is not economic loss...but property loss." *Id.* at 901.

As this Court well knows, economic loss occurs when there is no damage to property other than the defective product itself. *Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 91 (Tex.App.—Houston [1st Dist.] 2007, pet. denied). Thus, a claim alleging damages based entirely on the repair and replacement costs of a product constitutes pure economic loss. *James v. Bell Helicopter Co.*, 715 F.2d 166, 173 (5th Cir. 1983). Because Chevron's damages were not economic loss, Oceaneering argues that this Court must have found some kind of damage to the spar besides just the replacement costs of the defective bolts. This would mean that the damage was not limited to its defective work product thereby allowing one to possibly infer a finding of "property damage."

This is insufficient evidence for purposes of triggering coverage under the policy. A claim that is not economic loss simply means that it is a claim sounding in tort.[13] A tort claim does not automatically give rise to a claim that is covered under a CGL policy. Similarly, merely showing that a claim falls under the LPLA, without more, does not trigger coverage under the policy. Regardless of the theory

---

[13] *See Chevron USA, Inc.*, 604 F.3d at 900 ("When a product damages other property or causes personal injury, the action is for an unsafe product in tort. If the damage is instead to the product itself or a loss of profits, the action is properly in warranty or contract.").

of recovery, the insured must prove there was physical injury to tangible property beyond its own defective work product, something which Oceaneering has failed to do.

It is well established that the economic loss doctrine is a "liability defense or remedies doctrine, not a test for insurance coverage." *Lamar Homes*, 242 S.W.3d at 13 (citing *Ferrell v. W. Bend Mut. Ins. Co.*, 393 F.3d 786, 795 (8th Cir. 2005) (holding that a measure of damages under the economic loss doctrine is "distinct from the question of whether there was 'property damage' under the policy."). "The proper inquiry is whether an 'occurrence' has caused 'property damage,' not whether the ultimate remedy for that claim lies in contract or tort." *Lamar Homes*, 242 S.W.3d at 16.

The Texas Supreme Court was confronted with this very issue in *Lamar Homes. Id.* at 12-16. There, the insurer argued that CGL policies only afforded coverage for non-economic losses. *Id.* at 12. Thus, when presented with a claim for pure economic loss, the claim was to be automatically denied. The Court found this argument to be non-persuasive. *Id.* at 13. It noted that there are several cases in which a claim for pure economic loss may be covered under a CGL policy. *Id.* at 13, 16. It also recognized that if all economic losses were not covered *per se*, then several provisions contained within a CGL policy would be superfluous. *Id.* at 13. As previously stated, when interpreting an insurance policy a court must

24

read all parts of the policy together in order to give meaning to every sentence and to avoid rendering any portion inoperative. *Balandran*, 972 S.W.2d at 741 (Tex. 1998).

In essence, Oceaneering is making an argument similar to the one made by the insurer in *Lamar Homes*. The *Lamar Homes* insurer argued that if a loss is purely economic, it is automatically not covered. Oceaneering is arguing that if a loss is non-economic, it must automatically be afforded coverage. Having a tort claim does equate to a finding of coverage. Nor does having an LPLA claim necessarily mean there was physical injury to tangible property beyond the insured's defective work product.[14] The argument being made by Oceaneering has been explicitly rejected by the Texas Supreme Court, and it cannot serve as a basis for coverage in this case.

In addition, the policy language makes it clear that the insured's theory of recovery is irrelevant for purposes of determining coverage. The policy makes no distinction between tort and contractual damages. (ROA.69-134). The insuring agreement does not mention torts, contracts, or economic losses. (ROA.78). Nor do these terms appear in the definitions of "property damage" or "occurrence."

---

[14] Quite the contrary, *see, e.g., Hollybrook Cottonseend Processing, LLC v. Carver, Inc., et al.*, No. 09-0750, 2010 WL 2195685, at *3-4 (W.D. La. May 28, 2010) ("The LPLA's exclusivity is not limited to tort theories of liability." One can sue for both economic loss and non-economic loss.).

(ROA.88-89).    Rather, the policy's insuring agreement simply asks whether "property damage" has been caused by an "occurrence."  (ROA.78).

"Property damage" is defined as "physical injury to tangible property." (ROA.89).  This is a standard definition that courts have found to be unambiguous. The word "injury" standing alone may refer to both physical and non-physical damage, but when it is qualified by the word "physical," it means there must be physical damage to qualify as "property damage."  While a non-economic loss can also be a physical loss, the two phrases are not synonymous.  The insured must present some evidence of physical injury to tangible property beyond its own defective work product.  Oceaneering has not presented such evidence, nor can it be inferred from the holding in *Chevron I*.  The district court erred by using this opinion as basis for finding a genuine issue of material fact.

**4. The duty to indemnify is based on facts, not speculation.  The district court speculated as to whether there was latent physical damage to the Genesis Spar.**

In his analysis, Magistrate Smith stated that the entire facility may have been compromised by the defective bolts, "much the same way as a dam weakened by an earthquake."  (ROA.1046).  "Damage to the structure may not be immediately apparent."  (ROA.1046).  Finally, "[d]amage to the structural integrity of [a] larger structure is not an implausible type of 'property damage,' and offers a reasonable basis to distinguish the legal authorities relied upon by American Home."

(ROA.1046). The district court, in essence, denied American Home's Cross-Motion for Final Summary Judgment because of anticipatory property damage, as opposed to actual, proven property damage.

It is true that courts in Texas follow the "actual injury" rule, meaning that property damage occurs when (1) actual physical damage takes place, rather than when the damage manifests itself or becomes discoverable, assuming (2) that such damage occurs during the policy period. *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 24-30 (Tex. 2008). "The key date is when injury happens, not when someone happens upon it," and the focus should be on "when damage comes to pass, not when the damage comes to light." *Id.* at 22. Thus, for purposes of coverage, "occurs" means when *damage* occurs, not when *discovery* occurs. *Id.* at 30.

However, there comes a point when a potential future liability becomes so speculative that it can no longer justifiably be deemed a "claim." The duty to indemnify depends upon facts proven at trial. *D.R. Horton-Texas, Ltd. v. Markel Intern. Ins. Co., Ltd.*, 300 S.W.3d 740, 744 (Tex. 2009). This makes an insurer's duty to indemnify narrower in scope than its duty to defend an insured. *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 528 (5th Cir. 2004).

It has now been more than 11 years since Oceaneering first submitted its claim to American Home, more than 7 years since the underlying case has been

tried, and nearly 2 years since this declaratory judgment action has been filed. If Oceaneering had any documents in its possession, custody, or control that supports its claim for "property damage," those documents surely would have already been produced.[15] Mere speculation or suspicion as to the existence of latent damage cannot carry the insured's burden of triggering coverage under the policy.

Furthermore, "structural integrity is not tangible property, it is a characteristic of tangible property. As such, it cannot be physically injured separate from physical injury to tangible property." *Travelers Indem. Co. v. Page & Assocs. Const. Co.*, No. 07-97-0338-CV, 1998 WL 720957, at *6 (Tex.App.—Amarillo Oct. 15, 1998), vacated in part on other grounds on reh'g sub nom., No. 07-97-0338-CV, 1999 WL 7673 (Tex.App.—Amarillo Jan. 8, 1999, pet. denied). The only tangible property physically injured in this case was Oceaneering's defective work product. That type of loss is expressly excluded under the policy. (ROA.78-81). Merely stating that the structural integrity of the spar as a whole has been compromised is an insufficient basis for granting coverage.

It is true that some insurance policies recognize damage to a building's structural integrity to be a type of physical loss. *See, e.g., Strickland v. Fed. Ins. Co.*, 246 Cal. Rptr. 345, 350 (Cal. App. 2d Dist. 1988); *Murray v. State Farm Fire*

---

[15] In its Initial Disclosures (ROA.960-966), in which Fed. R. Civ. P. 26 requires "a copy of...all documents...that the disclosing party [Oceaneering]...may use to support its claims or defenses," the only document Oceaneering produced in support of its claim was the policy itself.

& *Cas. Co.*, 509 S.E.2d 1, 16-17 (W. Va. 1998) (both holding that the threat of future property damage constituted "direct physical loss" under a homeowners' policy).   However, under those policies there must be a "substantial risk" in the absence of remediation, so as to render the structure unsuitable or unusable.  *Id.* This is not the case with the Genesis Spar.  As stated by Magistrate Smith in his Memorandum and Recommendation, "it is undisputed that the spar was in continuous use at all relevant times, so there were no loss of use damages." (ROA.1043).    Surely if there was any entity concerned about the structural integrity of the spar, it would have been Chevron when it originally filed suit. However, the trial transcripts conclusively prove that Chevron only sought and was awarded damages for replacing the defective bolts.

Without any evidence of physical injury to tangible property beyond the work product of the insured, Oceaneering's claims fail as a matter of law. American Home's Cross-Motion for Final Summary Judgment should have been granted on the issue of "property damage."

### 5. Oceaneering has failed to meet its burden of establishing American Home's duty to indemnify.

Under Texas law, the insured bears the burden of establishing the insurer's duty to indemnify.  *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 723 (5th Cir. 1999).  The duty to indemnify is triggered by the actual

facts establishing liability in the underlying suit. *Trinity Univ. Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex. 1997). As explained by the Texas Supreme Court:

> The insurer's duty to indemnify depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the policy. Evidence is usually necessary in the coverage litigation to establish or refute an insurer's duty to indemnify. This is especially true when the underlying liability dispute is resolved before trial on the merits and there was no opportunity to develop the evidence...

*D.R. Horton-Texas, Ltd.*, 300 S.W.3d at 744.

Here, Oceaneering has had ample opportunity to establish coverage under the policy. The bolt failures were first discovered in 2002. The underlying lawsuit was filed in 2003, after which Oceaneering conducted nearly four years' worth of discovery. The case went to trial in 2007 and lasted two weeks. From there, Oceaneering became involved in a series of post-trial motions, proceedings, appeals, and the instant coverage dispute. And still, Oceaneering cannot point to a single piece of evidence demonstrating that the damages awarded to Chevron relate to anything other than its replacement costs. Oceaneering is relying entirely on an inference that cannot be drawn from this Court's holding in *Chevron I*. Oceaneering has thus failed to establish a duty to indemnify. Accordingly, American Home's Cross-Motion for Final Summary Judgment must be granted with respect to "property damage," and coverage must be denied as a matter of law.

**B. The district court was correct in its application of the "sistership" exclusion.**

Even assuming that Oceaneering's work caused "property damage" to the Genesis Spar, the "sistership" exclusion applies, barring coverage. By its terms, the exclusion eliminates coverage for damages incurred for the replacement or removal of the insured's product if such product is withdrawn from the market or from use because of a defect in the product. (ROA.81). The exclusion is called a "sistership" exclusion because it arose following an airplane crash after which the airplane's "sister ships" were grounded and recalled to correct a common defect. *See, e.g., Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 419 (5th Cir. 1982).

**1. The district court correctly differentiated between the bolts whose heads were missing and the remaining "sister" bolts because only the former were shown to have caused "property damage" to the Genesis Spar.**

The sistership exclusion applies only to preventative or curative actions taken to prevent future accidents or property damage. *Id.* It does not apply to damage that has already occurred. *Id.* Oceaneering argues that once the bolts were installed into the Genesis Spar, "property damage" had occurred by virtue of their installation, so any withdrawal is no longer a preventative measure.

The problem with this argument is that only some bolts were shown to have caused "property damage." "Property damage" is defined under the policy to

occur at the time of the physical injury that caused it. The only bolts that were shown to have caused "property damage" were the ones with the missing heads. The rest were removed before causing any further physical damage. If an insured's product, although put to use, has not yet caused damage simply by virtue of it having been put to use, the sistership exclusion should be applicable.

### 2. Oceaneering's work on the Genesis Spar qualifies as "your work" and/or "your product" as these terms are defined under the policy.

The sistership exclusion precludes coverage for any costs incurred due to the withdrawal, repair, or replacement of "your work" or "your product." (ROA.81). "Your work" is defined to mean "work or operations performed by the insured or on the insured's behalf" and "materials, parts, or equipment furnished in connection with such work or operations." (ROA.89). It also includes "the failure to provide warnings or instructions" in connection with such work. (ROA.89). As noted by the district court, Oceaneering began the installation work on the Genesis Spar before delegating the rest of the work to a co-defendant, with instructions to use the bolts at issue. (ROA.1048). This clearly falls into the definition of "your work" under the policy.

In an attempt to avoid this definition, Oceaneering brings up the fact that American Home paid $148,426.32 to Oceaneering early in this coverage dispute. Oceaneering claims that American Home was compelled to pay this amount, by virtue of Oceaneering's comparative fault in installing the bolts. Thus, the

$148,426.32 represents Oceaneering's "work" on the Genesis Spar, and the indemnification payment made to Aker represents Aker's "work." Oceaneering argues that since Aker's work is the subject of this coverage dispute, the indemnification payment cannot be subject to the sistership exclusion as Aker is not an insured under the policy.

Oceaneering well knows that any amounts that were paid by American Home to Oceaneering were done under a reservation of rights and in no way can be used as a means to implicate coverage under the policy. American Home simply made the payment in order to maintain an ongoing relationship with a valued insured. American Home properly reserved any and all defenses under the policy. Therefore, it is highly improper for Oceaneering to use this payment as an effort to prove coverage exists under the policy.

Alternatively, Oceaneering's work on the Genesis Spar falls under the definition of "your product." "Your product" is defined to include any product that is handled by Oceaneering, as well as any warranties or representations made at any time with respect to the quality or use of the product, and a failure to give instructions or warnings regarding the product. (ROA.89). Contrary to Oceaneering's assertions, there is no requirement that Oceaneering sell or manufacture a product before the exclusion can apply. All that is required is for Oceaneering to handle the product in order for it to become "your product."

Oceaneering clearly handled the bolts at issue, as it was directly involved in the installation process. The district court was correct in holding that the sistership exclusion applies to the facts of this case.

## C. Coverage is also barred under the contractual liability exclusion.

Oceaneering's claims clearly fall within the contractual liability exclusion, and neither exception applies. The contractual liability exclusion is embodied in Section 2(b) of the Policy. (ROA.78). It provides that the policy does not apply to "property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." (ROA.78). Oceaneering unambiguously assumed the liability of Chevron and its agents in the MSA. (ROA.905-909). Therefore, the exclusion applies, barring coverage.

Furthermore, none of the exceptions apply to bring the claim back into coverage. For example, for the first exception to apply, (1) the MSA must have been an "insured contract" and (2) there must have been "property damage" that occurred subsequent to the execution of the MSA. (ROA.78). As discussed extensively throughout this brief, there was no damage, let alone "property damage," beyond the defective bolts. The second criteria of the first exception was not fulfilled thus rendering the exception inapplicable.

The second exception also does not apply because Oceaneering would not have been liable to Aker in the absence of the MSA. (ROA.78). But for the

contract Oceaneering had with Chevron, Aker would have had no claim against Oceaneering for contractual indemnification. This exception, therefore, is also inapplicable. The contractual liability exclusion bars coverage in this case. American Home's Cross-Motion for Final Summary Judgment should have been granted on this issue.

## V. CONCLUSION & PRAYER

The district court erred by not granting American Home's Cross-Motion for Final Summary Judgment with respect to "property damage" and the contractual liability exclusion. Accordingly, the Fifth Circuit should reverse and render judgment on both of these issues. The district court was correct in its application of the "sistership" exclusion. Therefore, the Fifth Circuit should affirm the holding with respect to the "sistership" exclusion, as well as affirm the final judgment of the district court in that Oceaneering takes nothing on its claims against American Home.

WHEREFORE, PREMISES CONSIDERED, Appellee/Cross-Appellant, American Home Assurance Company respectfully requests this Court to (1) reverse and render the district court's holding with respect to "property damage" and the contractual liability exclusion; (2) affirm the district court's holding with respect to the "sistership" exclusion; (3) affirm the final judgment of the district court in that Oceaneering takes nothing on its claims against American Home; and

(4) award American Home all other and further relief to which it may be justly entitled.

Respectfully submitted,

//s// *Jeffrey R. Bale*

Jeffrey R. Bale
State Bar No. 01629800
Fed. I.D. No. 3324
Kensington I, Suite 200
1600 Highway 6 South
Sugar Land, Texas 77478
Telephone:   (281) 295-6000
Facsimile:   (281) 295-6010
Email:     jbale@balelawfirm.com
*Attorney for Plaintiff / Appellee,*
*American Home Assurance Company*

OF COUNSEL:

Jonathan C. Anderson
State Bar No. 24040433
Federal I.D. 622375
THE BALE LAW FIRM, PLLC
Kensington I, Suite 200
1600 Highway 6 South
Sugar Land, Texas 77478
Telephone:   (281) 295-6000
Facsimile:   (281) 295-6010
Email:     janderson@balelawfirm.com
*Attorney for Plaintiff / Appellee,*
*American Home Assurance Company*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I am a member of the firm of THE BALE LAW FIRM, PLLC, attorneys for Plaintiff / Appellant, and that I have provided a copy of the foregoing to all counsel of record via the ECF Filing System this **18th** day of **September, 2014**.

**Via the ECF Filing System**
Mr. Michael A. Orlando
Ms. Kristi L. Hamilton
Mr. Mike A. Orlando, Jr.
Meyer Orlando LLC
13201 Northwest Frwy., Suite 119
Houston, Texas 77040

*//s// Jeffrey R. Bale*
Jeffrey R. Bale

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B) because it does not contain more than 16,500 words. This brief contains 8,655 words, exclusive of the exempted portions. The word count was calculated using Microsoft Word 2010, the word processing system used to prepare this brief.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font for the text and 12-point font for the footnotes.

*//s// Jeffrey R. Bale*
Jeffrey R. Bale
